**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE NEW INVESTMENTS, INC,
                              *Debtor.*

PACIFICA L 51 LLC,
              *Creditor-Appellant*,

v.

NEW INVESTMENTS INC.,
                *Debtor-Appellee.*

No. 13-36194

D.C. No.
13-10948-MLB

OPINION

Appeal from the United States Bankruptcy Court
for the Western District of Washington
Marc Barreca, Bankruptcy Judge, Presiding

Argued and Submitted May 3, 2016
Seattle, Washington

Filed November 4, 2016

Before: Susan P. Graber, Marsha S. Berzon,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia;
Dissent by Judge Berzon

# SUMMARY[*]

## Bankruptcy

The panel reversed the bankruptcy court's order confirming a debtor's Chapter 11 plan of reorganization, which proposed to cure the debtor's default on a loan by a payment that reflected a pre-default interest rate and extinguished any other late penalties required under the loan agreement.

A Chapter 11 plan may include a provision authorizing the debtor to remedy any breach of a loan agreement with a creditor and return to pre-default conditions. *Great W. Bank & Tr. V. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988), held that a debtor that cures a default is entitled to avoid all consequences of the default, including higher post-default interest rates. The panel held that this rule of *Entz-White*, allowing a curing debtor to avoid a contractual post-default interest rate in a loan agreement, is no longer good law in light of later-enacted 11 U.S.C. § 1123(d), which provides that, if a plan proposes to cure a default, "the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." The panel remanded the case for further proceedings.

Dissenting, Judge Berzon wrote that neither 11 U.S.C. § 1123(d) nor any other provision of the Bankruptcy Code

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

provides a definition of "cure" contrary to the one announced in *Entz-White*. Accordingly, *Entz-White* has not been displaced. Judge Berzon would affirm the bankruptcy court's order confirming the debtor's plan of reorganization, which reflects the pre-default interest rate included in the promissory note.

**COUNSEL**

Dillon E. Jackson (argued) and Terrance J. Keenan, Foster Pepper PLLC, Seattle, Washington; Stuart P. Kastner, Stuart P. Kastner PLLC, Seattle, Washington; for Creditor-Appellant.

Lawrence K. Engel (argued), Bellevue, Washington, for Debtor-Appellee.

**OPINION**

MURGUIA, Circuit Judge:

In loan agreements—and any subsequent bankruptcy proceedings—a borrower "defaults" on a loan when he fails to fulfill a material obligation under the terms of the loan agreement, such as making a payment by a particular date. A default can trigger certain consequences, such as foreclosure on any property securing the loan, late fees and penalties, or "acceleration," which occurs when the entire unpaid amount of the loan becomes immediately due and payable. But the borrower can also "cure" the default, most often by paying the arrearages and bringing the loan current. A cure generally allows the borrower to avoid the consequences of default,

restores the loan to its original terms, and allows the borrower to keep the property.

The Bankruptcy Code incorporates the concept of cure. Chapter 11 provides that a debtor's plan of reorganization must "provide adequate means for the plan's implementation," including the "curing or waiving of any default." 11 U.S.C. § 1123(a)(5)(G). This statute means that a plan of reorganization may include a provision authorizing the debtor to remedy any breach of a loan agreement with a creditor and return to pre-default conditions. *Great W. Bank & Tr. v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*, 850 F.2d 1338, 1340 (9th Cir. 1988).

We held in *Entz-White* that a debtor who cures a default "is entitled to avoid all consequences of the default— including higher post-default interest rates." *Id.* at 1342. In other words, if a loan agreement provided for a higher, post-default interest rate on arrearages in the event of default, a debtor who "cures" is entitled to repay the arrearages at the lower, pre-default interest rate. We concluded that "the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest," even when the terms of the loan agreement called for a higher interest rate upon default. *Id.*

The case before us requires us to decide whether *Entz-White*'s rule that a debtor may nullify a loan agreement's requirement of post-default interest remains good law in light of 11 U.S.C. § 1123(d), a provision that Congress enacted after *Entz-White*. Section 1123(d) provides that, if a plan proposes to cure a default, "the amount necessary to cure the default shall be determined in accordance with the underlying

agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). We hold that *Entz-White*'s rule of allowing a curing debtor to avoid a contractual post-default interest rate in a loan agreement is no longer valid in light of § 1123(d).

I.

New Investments, Inc. ("New Investments") borrowed $3,045,760.51 from Pacifica L 51, LLC's ("Pacifica") predecessor in interest to purchase a hotel property in Kirkland, Washington. The note, which was secured by a deed of trust, provided for an interest rate of 8 percent. The note also specifically provided that in the event of default, the interest rate would increase by 5 percent.

New Investments defaulted on the note in 2009. When Pacifica commenced non-judicial foreclosure proceedings, New Investments filed for Chapter 11 bankruptcy. New Investments's plan of reorganization proposed to cure the default by selling the property to a third party and using the proceeds of the sale to pay the outstanding amount of the loan at the pre-default interest rate. Pacifica objected to the plan on the ground that, under the terms of the note, it was entitled to be paid at the higher, *post-default* interest rate.

The bankruptcy court confirmed New Investments's plan over Pacifica's objection and authorized the sale of the hotel for $6,890,000. Of the sale proceeds, $2,830,877.28 would be paid to Pacifica, reflecting the *pre-default* interest rate and extinguishing any other late penalties. Anticipating an appeal, the bankruptcy court ordered that $100,000 of the proceeds be reserved for Pacifica's attorney's fees on appeal and that $670,000 be set aside as a disputed claim reserve for

Pacifica.    Pacifica timely appeals from the confirmation order.

## II.

We have jurisdiction under 28 U.S.C. § 158(d), and we review the bankruptcy court's interpretation of bankruptcy statutes de novo.    *Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1090 (9th Cir. 2009).    "When construing the meaning of a statute, we begin with the language of that statute." *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1118 (9th Cir. 2015).    "If the statutory text is ambiguous, we employ other tools, such as legislative history, to construe the meaning of ambiguous terms." *Id.* "A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521 (1989).

## III.

Chapter 11 of the Bankruptcy Code provides that a plan of reorganization must, among other things, "provide adequate means for the plan's implementation," including the "curing or waiving of any default."    11 U.S.C. § 1123(a)(5)(G).    In *Entz-White*, we observed that the Bankruptcy Code did not define "cure."    850 F.2d at 1340. We borrowed the Second Circuit's definition: "A default is an event in the debtor-creditor relationship which triggers certain consequences.    Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified.    This is the concept of 'cure' used throughout the Bankruptcy Code." *Id*. (alteration omitted) (quoting *Di Pierro v. Taddeo (In re Taddeo)*,

685 F.2d 24, 26–27 (2d Cir. 1982)). We held that "the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." *Id.* at 1342. As a result, a debtor whose plan proposed to cure a default would allow him to avoid having to pay a higher, post-default interest rate called for in the loan agreement.

*Entz-White* was decided in 1988. In 1994, Congress amended § 1123 to add subsection (d). Pub. L. No. 103-394, Title II, § 305, Oct. 22, 1994, 108 Stat. 4106. Subsection (d) provides:

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

11 U.S.C. § 1123(d).

Subsection § 1123(d) renders void *Entz-White*'s rule that a debtor who proposes to cure a default may avoid a higher, post-default interest rate in a loan agreement. Subsection (d) governs here because New Investments's plan proposes to cure a default. The underlying agreement—here, the promissory note—requires the payment of a higher interest rate upon default. And "applicable nonbankruptcy law"— here, Washington state law—allows for a higher interest rate

upon default when provided for in the loan agreement.[1]  *See* Wash. Rev. Code Ann. § 61.24.090(1)(a) (providing that a borrower may cure a monetary default by paying the trustee "[t]he entire amount then due under the terms of the deed of trust and the obligation secured thereby, other than such portion of the principal as would not then be due had no default occurred").  In other words, under § 1123(d), "the amount necessary to cure [New Investments's] default" is governed by the deed of trust and Washington law, which respectively require and permit repayment at a higher, post-default interest rate.

The plain language of § 1123(d) compels the holding that a debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by proposing a cure.  But even if we were to read ambiguity into the statute, the legislative history would not help New Investments.  The House Report for the bill that became § 1123(d) states that Congress was primarily concerned with overruling the Supreme Court's decision in *Rake v. Wade*, 508 U.S. 464 (1993).  H.R. Rep. No. 103-835, at *55 (1994).  *Rake* had held that a Chapter 13 debtor who proposed to cure a default was required to pay interest on his arrearages to a secured creditor even if the underlying loan agreement did not provide for such interest.  508 U.S. at 472.  Congress viewed this as an untoward result that allowed for "interest on

---

[1] We reject New Investments's argument that Washington's deed of trust law cannot constitute "applicable nonbankruptcy law" under § 1123(d) because the Bankruptcy Code's automatic stay would prevent foreclosure under Washington law. *See* 11 U.S.C. § 362(a); Wash. Rev. Code Ann. § 61.24.040. This reading would render the phrase "applicable nonbankruptcy law" meaningless because the automatic stay would always trump state law foreclosure provisions, contrary to the statutory text and intent.

interest payments" and provided an unbargained-for windfall to creditors.  H.R. Rep. No. 103-835, at *55.  The House Report states that § 1123(d) would "limit the secured creditor to the benefit of the initial bargain with no court contrived windfall." *Id.*  It further stated that it was "the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." *Id.*

The fact that Congress had a particular purpose in mind when enacting a statute does not limit the effect of the statute's text, a principle *Entz-White* itself recognized.  *See* 850 F.2d at 1341 (noting that a Senate Report for the bill that became 11 U.S.C. § 1124 showed "only that the drafters in the Senate were concerned primarily with defaults resulting in acceleration; it does not show that they meant to confine the section to that situation").  Rather, "[t]he fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991).  By its terms, § 1123(d) tells us to look to the promissory note and Washington law to determine what amount New Investments must pay to cure its default.  Here, that analysis requires the payment of post-default interest.

This result is further consistent with the intent of § 1123(d) because it holds the parties to the benefit of their bargain.  Moreover, the House Report's statement "that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred" is consistent with the concept of cure generally, which § 1123(d) has not altered or attempted to define.  *See Taddeo*, 685 F.2d at 26–27 ("Curing a default commonly means taking care of the

triggering event and returning to pre-default conditions. The consequences are thus nullified.").

What § 1123(d) affects is *how* a debtor returns to pre-default conditions, which can include returning to a lower, pre-default interest rate. In the traditional case, a borrower who has defaulted on a loan obligation can cure the default by paying arrearages. *See* Restatement (Third) of Property (Mortgages) § 8.1(b) & cmt. c (1997); Wash. Rev. Code Ann. § 61.24.090(a)(1). This procedure allows the borrower to avoid acceleration or foreclosure, which are some of the more common consequences of default. *See* Restatement (Third) of Property (Mortgages) § 8.1(a); Wash. Rev. Code Ann. § 61.24.090(a). However, the borrower does not effectuate a cure merely by paying past due installments of principal at the pre-default interest rate. Rather, the borrower's cure obligations may also include "late charges, attorneys' and trustee's fees, and publication and court costs." Restatement (Third) of Property (Mortgages) § 8.1 cmt. c; *see also* Wash. Rev. Code Ann. § 61.24.090(1)(b). It is only once these penalties are paid that the debtor can return to pre-default conditions as to the remainder of the loan obligation.

The common law treatment of cure is consistent with the Bankruptcy Code's protections for creditors who would have been entitled to receive accelerated payment on a defaulted loan. For a debtor to render such a creditor "unimpaired" and unable to object to the debtor's plan, *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1075 (9th Cir. 2002); 11 U.S.C. § 1126(f), the debtor must cure the default but may not "otherwise alter the legal, equitable, or contractual rights" of the creditor, 11 U.S.C. § 1124(2)(E). Here, one of those rights is post-default interest, and New Investments's cure may not alter that right.

Consistent with § 1124(2), the debtor can return to pre-default conditions, which can include a lower, pre-default interest rate, only by fulfilling the obligations of the underlying loan agreement and applicable state law. 11 U.S.C. § 1123(d). By its terms, § 1123(d) requires that we look to the "underlying agreement," not only to the "pre-default interest provisions" of the underlying agreement. To read any such limitation into § 1123(d) would be "to add specific language that Congress did not include in a carefully considered statute." *Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557, 572, (1983); *see also United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 649 (2d Cir. 1993) ("[W]e cannot add to the statute what congress did not provide."). Here, the note provided that upon default, the interest rate on the loan would increase by 5 percent. Unfortunately for New Investments, the increased interest rate applies to the entirety of the note and not just to arrearages.

We are mindful that "[t]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (internal quotation marks omitted). And Congress wanted to protect debtors against unbargained-for interest requirements in enacting § 1123(d). But the Bankruptcy Code is not a purely remedial statute. *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008). "Rather, Chapter 11 strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." *Id.* If the loan agreement did not require a higher, post-default interest rate, New Investments would not have to pay it. However, today's result holds New Investments to *its* bargain by adhering to the terms of its loan agreement with Pacifica, as required by § 1123(d).

Both the text and the legislative history of § 1123(d) make clear that the provision was intended to limit parties to the benefit of their bargain when a debtor seeks to effectuate a cure and return to pre-default conditions. The parties bargained for a higher interest rate on the note in the event of default, and Pacifica is entitled to the benefit of that bargain under the terms of § 1123(d).

IV.

We conclude that Pacifica is entitled to receive payment of the loan at the post-default interest rate. We therefore reverse the decision of the bankruptcy court and remand for further proceedings.

**REVERSED and REMANDED.**

BERZON, Circuit Judge, dissenting:

Neither 11 U.S.C. § 1123(d) nor any other provision of the Bankruptcy Code provides a definition of "cure" contrary to the one this Court announced in *Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc.* (*In re Entz-White Lumber & Supply, Inc.*), 850 F.2d 1338, 1340 (9th Cir. 1988). We are therefore bound by this Court's precedent, according to which New Investments may, in curing its default, pay the pre-default interest rate contained in the promissory note.

Instead of abiding by our longstanding case law, the majority concludes that Congress displaced *Entz-White* when it passed § 1123(d). Because neither the text of the statute

nor the legislative history of § 1123(d) support the majority's departure, I dissent.

## I.

Chapter 11 requires that a debtor's plan of reorganization "provide adequate means for the plan's implementation, such as . . . curing or waiving of any default." 11 U.S.C. § 1123(a)(5). In the absence of any statutory definition, this Court held in *Entz-White* that "[c]uring a default" means "returning to pre-default conditions," such that any consequences of the default are "nullified." 850 F.2d at 1340 (quoting *Di Pierro v. Taddeo* (*In re Taddeo*), 685 F.2d 24, 26–27 (2d Cir. 1982)). Because curing a default returns the debtor to the status quo ante, we concluded, "the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." *Id.* at 1342.

After this Court decided *Entz-White*, Congress enacted 11 U.S.C. § 1123(d). Section 1123(d), part of the 1994 amendments to the Bankruptcy Code, provides:

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Pacifica maintains—and the majority agrees—that this provision overruled *Entz-White*'s holding that a debtor who cures a default, thus "nullify[ing] all consequences of" that

default, may repay arrearages at the pre-default interest rate. *See* 850 F.3d at 1342.

Pacifica bears the burden of showing that Congress, in passing § 1123(d), intended to change settled law. *Tome v. United States*, 513 U.S. 150, 163 (1995) (quoting *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521 (1989)). In determining whether Pacifica has met this burden, we "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (citations and internal quotation marks omitted).

Pacifica has not carried this burden, as both the statutory text and the legislative history of § 1123(d) support the continuing viability of *Entz-White*'s holding. The majority opinion errs in concluding otherwise, and, in doing so, wrongly imposes a severe penalty on debtors in New Investments' situation.

## II.

The Bankruptcy Reform Act of 1994, among other things, added nearly identical language regarding how one cures a default to Chapters 11, 12, and 13 of the Bankruptcy Code. Pub. L. No. 103-394, § 305, 108 Stat. 4106 (1994). Like the subsection here at issue, 11 U.S.C. §§ 1222(d) and 1322(e) provide that, notwithstanding other provisions of the Bankruptcy Code not relevant here, "if it is proposed in a plan to cure a default, the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."

Nowhere did the 1994 amendments define "cure a default" or suggest that this Circuit's then-operative definition of "cure" was incorrect.  Rather, § 1123(d) indicates which materials the parties may consult in determining *how* to cure a default.  Accordingly, as a result of the 1994 amendments, the *terms* of a cure are circumscribed by the underlying agreement and applicable nonbankruptcy law.

Neither § 1123(d) nor any other provision of the Bankruptcy Code explains *where* in the underlying agreement to look for the provisions that apply in the event of a cure.  If, as *Entz-White* held, "[c]uring a default" means "returning to pre-default conditions," 850 F.2d at 1340, the provisions of the agreement setting out the pre-default interest rate provide the relevant information.  If "curing a default" means paying a penalty triggered by the default, the provisions of the agreement addressing higher post-default interest rates establish the relevant requirements.  But in *Entz-White*, we decisively rejected this alternative definition of "cure."  *Id.* at 1342.  We called the creditor's argument in favor of this reading "spurious," as it "amount[ed] to saying, once more, that the higher rate of interest is not a consequence of default that can be cured."  *Id.*

In short, the text of § 1123(d) makes clear that New Investments' cure will be based on the terms of the promissory note, but offers no guidance on which of the note's provisions governs here.  *Entz-White* provides that guidance, by specifying that a "cure" permits the debtor to "avoid all consequences of the default."  *Id.*  Applying that understanding, it is the pre-default interest provisions of the underlying agreement that govern.  The majority's conclusion

that § 1123(d) overruled *Entz-White* has no basis in the text of the statute.

## III.

The legislative history of § 1123(d) confirms that Congress did not mean to disturb this Court's holding in *Entz-White.* In adding § 1123(d), Congress focused on addressing an entirely separate matter—the Supreme Court's holding in *Rake v. Wade*, 508 U.S. 464 (1993). H.R. Rep. No. 103-835, at 55 (1994); *see also* S. Rep. No. 103-168, at 53 (1993) (discussing the parallel provision included in the Senate bill).

In *Rake*, the Supreme Court held that an oversecured creditor was entitled to pre- and post-confirmation interest on mortgage arrearages paid to cure a default under a Chapter 13 plan. 508 U.S. at 471–75. This reading of the relevant provisions of the Bankruptcy Code, §§ 506(b), 1322(b), and 1325(a)(5), permitted secured creditors to collect interest on top of the interest payments paid by debtors under their mortgages. *Id.* at 470–75.

Congress overtly rejected this result in enacting § 1123(d). H.R. Rep. No. 103-835, at 55. The amendments to § 1123 were contained in § 305 of the Bankruptcy Reform Act of 1994, which is entitled "Interest on Interest." Pub. L. No. 103-394, § 305, 108 Stat. 4106, 4134 (1994). The relevant House Report states that the amendments "will have the effect of overruling the decision of the Supreme Court in *Rake v. Wade*," because *Rake* "had the effect of providing a windfall to secured creditors" by giving them "interest on interest payments, and interest on the late charges and other fees, even where applicable laws prohibit[] such interest and even when it was something that was not contemplated by

either party in the original transaction." H.R. Rep. No. 103-835, at 55.

Far from repudiating *Entz-White*'s holding, the House Report reiterated *Entz-White*'s interpretation of "cure," stating, "[i]t is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." *Id.* The legislative history thus indicates, at the very least, that the new provision was not meant *sub silentio* to enact a definition of "cure" conflicting with that adopted in *Entz-White*. It also suggests that the relevant provisions of the "underlying agreement" for a "cure" are those that would have applied "if the default had never occurred." *See id.*

In sum, the pertinent 1994 amendments eliminated the possibility of a "court contrived windfall" for secured creditors. *Id.* Pacifica's challenge to the Bankruptcy Court's confirmation order does not implicate the concern that animated Congress. Like the text of the statute, the legislative history in no way suggests that *Entz-White*'s definition of "cure" is incorrect or was overruled.

Here, the underlying agreement provides both pre- and post-default interest rates. As the statute requires, we look to that agreement in determining which rates may apply. And in selecting which provision of the contract governs, we rely on our precedent and use the pre-default rate. New Investments therefore could cure the default by paying interest on the debt at the pre-default rate.

**IV.**

Notwithstanding its recitation of the relevant text and legislative history, the majority somehow concludes that *Entz-White* is no longer controlling. Relying on an incorrect interpretation of § 1123(d), the majority's opinion mistakenly upsets this Circuit's binding precedent.

A three judge panel of this Court is "bound by decisions of prior panels unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions." *Gen. Const. Co. v. Castro*, 401 F.3d 963, 975 (9th Cir. 2005) (quoting *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 983 (9th Cir. 2002)). No act of Congress or intervening higher authority justifies the panel's departure from our precedent here.

As discussed, Congress has not defined "cure the default" in the years since we decided *Entz-White*. There is thus no "clear indication that Congress intended . . . a departure," *Hamilton*, 560 U.S. at 517, from this Court's past practice. The interpretation of the statute best supported by the legislative record favors continuity. No intervening case law from the Supreme Court or the Ninth Circuit calls *Entz-White* into doubt. On the contrary, this Court has continued to rely on *Entz-White*'s holding. *See Platinum Capital, Inc. v. Sylmar Plaza, L.P.* (*In re Sylmar Plaza, L.P.*), 314 F.3d 1070, 1075 (9th Cir. 2002) (concluding *Entz-White* precluded a creditor's argument "that a plan intended to nullify the consequences of a default (thereby avoiding the higher post-default interest rate) does not meet the purposes of the Bankruptcy Code"); *cf. Gen. Elec. Capital Corp. v. Future Media Prods. Inc.*, 547 F.3d 956, 960–61 (9th Cir. 2008) (treating *Entz-White* as good law, but concluding it did not

apply to a claim paid in full as a result of asset sales outside of a Chapter 11 plan).

*Stare decisis* thus requires us to apply *Entz-White* and hold that New Investments "is entitled to avoid all consequences of the default—including higher post-default interest rates." 850 F.2d at 1342. I would affirm the Bankruptcy Court order confirming New Investments' plan of reorganization, which reflects the pre-default interest rate included in the promissory note.